"The jury find that the land in question was granted to William Wells in the year 1735; who some years afterwards, by his last will and testament devised the same to his two sons, Joseph and Henry, in the following manner, viz.: "I give and devise the plantation whereon I live to my two sons, Joseph and Henry, and their heirs lawfully begotten of their bodies forever; to be divided, each of them to have one-half of the wood land and one-half of the cleared ground; and in want of heirs of either of them, then the whole to go to the survivor or his heirs, and in failure of both of their heirs, then to my right heirs forever," and died in the year 1743. Henry died under age and without issue (538) in 1749. Joseph, who survived Henry, by deed of bargain and sale, bearing date the 3d day of February, 1761, for a valuable consideration, conveyed the land in question to Stephen Lee and his heirs forever. The operative words in the deed are "give, grant, bargain, sell, alien, enfeoff, convey, and confirm," with a covenant or warranty in the words following, to wit: "And furthermore, I, the said Joseph Wells, for myself, my heirs, executors, and administrators, do covenant, grant, promise, engage, and agree to and with the said Stephen Lee, his heirs, executors, administrators, and assigns, the above bargained land and premises, together with all the privileges and appurtenances thereunto belonging, forever hereafter, to warrant and defend against the lawful claim or demand of all manner of persons whatever." Stephen Lee and those claiming under him have been in possession of the land ever since. Joseph Wells died in the year 1787, leaving issue, David, his eldest son, William, his second son, and two daughters. David Wells died in 1798, leaving issue, Jason, the lessor of the plaintiff, Joseph and Elizabeth. Upon these facts the jury doubt, and pray the opinion of the Court.
1. The defendant contends that Joseph Wells was seized in fee. The words of the devise are, "To my two sons, Joseph and Henry, and their heirs lawfully begotten of their bodies forever, to be divided; each of them to have one-half of the cleared ground, and each of them one-half of the wood land; and in want of heirs of either of them, then the whole to go to the survivor or his heirs, and on failure of both their heirs, then to my right heirs forever." It is admitted that by the former part of this devise estates tail are granted to Joseph and Henry, and that the words "in want of heirs of either of them" are to be construed as if they were "in want of heirs of the body of either of them"; because it is impossible that either of them should die without heirs as long as the other survived. Webb v.Herring, Cro. Jas., 416. But it is contended that the subsequent words, "and in want of heirs of either of them, then the whole to go to the survivor or his heirs," did, upon the death of Henry without issue, in the lifetime of Joseph, vest in him (Joseph) an absolute estate in fee. The very definition of an estate in fee simple is, where lands are given to a man and his heirs, generally and simply, without specifying what heirs, but referring that to his own pleasure, or to the disposition of the law. This is plainly the case here, "the whole to go to the survivor or his heirs" — not heirs male nor heirs female, not heirs of his body, but heirs generally. The last words of the devise, "and in failure of both their heirs, then to my right heirs forever," cannot, under the authority of the rule laid down in Webb v. Herring, supra, and in the other cases reported in the books on the same head, be considered as confining the meaning of the word "heirs" just before used to that of heirs of the body; because it is not impossible that the sons should die entirely without heirs while there were heirs remaining of the father. The heirs of the father are not necessarily the heirs of the son, as the father may have children by different venters, who cannot inherit from each other. It is therefore believed that, under the devise, each son was tenant in tail of the part to him devised, with remainder in the whole to the survivor in fee, and that the subsequent limitation over to the right heirs of the devisor is void, it being a limitation of a fee upon a fee.
2. If, however, it should be thought that Joseph Wells was but a tenant in tail at the time of his conveyance to Stephen Lee, it is then contended that by that conveyance a discontinuance was made, which took away the right of entry of the issue in tail, and that an ejectment cannot be supported. *Page 441 
No position appears to be laid down in our law with more clearness or more force than that an ejectment will not lie, except the lessor of the plaintiff have in him a right of entry. Runnington on Ejectments, pages 10 and 11; 3 Black. Comm., 206; 3 Woodeson, 44 and 45.
Lord Coke defines a discontinuance, Co. Litt., 325 a, to be "an alienation made or suffered by tenant in tail, or by any that is seized inauter droit, whereby the issue in tail, or the heir, or successor, or those in reversion or remainder, are driven to their action, and cannot enter." Estates tail are known to have originated from what were termed at common law "fees conditional." These were fees limited and restrained to some particular heirs exclusive of others, as to the heirs of a man's body, by which only his lineal descendants were admitted, in exclusion of collateral heirs. A gift thus made, to a man and the heirs of his body, was considered as a gift on condition, that the thing given should revert to the donor, if the donee had no heirs of his body, but if he had, that it should remain to the donee. As soon as the donee had issue, his estate became to most purposes absolute. — He could alien the land, and thereby bar his issue, and also him in reversion. The nobility of England, anxious to perpetuate their possessions in their families, procured the statute "dedonis conditionalibus" (13 Edw. 1), to be made, by which it was enacted that from henceforth in such gift the will of the donor should be observed, and that the lands so given should at all events go to the issue, if there were any, or, if none, should revert to the donor. Upon the construction of this statute it was determined that an estate of inheritance still remained in the donor; this got the name of an estate tail. Innumerable inconveniences attended estates tail. Some of them are stated with great force and elegance by Justice Blackstone in his Commentaries. Children grew disobedient — farmers were ousted of their leases made by tenants in tail — creditors were defrauded of their debts — latent entails were produced to deprive purchasers of the lands they had fairly bought — and treasons became frequent. They were justly branded as the source of new contentions and mischiefs unknown to the common law, and almost universally considered as the common grievances of the realm. InAnthony Mildmay's case, reported 6 Co. Rep., 40, it was resolved by the Judges that "these perpetuities," so they style them, "were against the reason and policy of the common law." In Mary Portington's case, 10 Rep., 42, it was observed "that these perpetuities were born under some unfortunate constellation," and similar expressions are frequently met with in the ancient reporters. It is not therefore to be wondered at that various artifices were used to elude these new restraints upon property. One of these was carried into effect through the medium of a discontinuance. This cannot perhaps be better explained than by using the language of the eminent conveyancer and *Page 442 
lawyer, Mr. Butler, in one of his Annotations on Coke Litt., 15 Ed., Hargrave and Butler's Co. Litt., 191 a, note 77, v. 8. "It has been observed that though the statute de donis took away the power of lawful alienation, it did not suspend the vesting of the fee. The alienation, therefore, of the donee, tenant in tail, was no forfeiture; and the alienee, as he took his conveyance from a person seized of the fee, was considered as coming in under a lawful transfer of the inheritance. Now it was an established rule of law that whenever any person acquired a presumptive right of possession, his possession was not to be defeated by entry. The consequence of this was that in these cases the alienation was unimpeachable during the life of the alienor, and after his decease, the heir could not assert his title by the summary process of entry, but was driven to the expensive and dilatory process of formedon: this was termed a discontinuance. The expense and delay attending a formedon frequently prevented the tenant in tail from resorting to it to assert his right. In the course of time the period for asserting it elapsed, and thus therefore, virtually, the discontinuance proved a bar to the entail." It was not, however, by every mode of conveyance that a tenant in tail could operate a discontinuance. No conveyance but such as took effect by way of transmutation of the possession, or such as on account of the particular solemnities attending them were deemed sufficient to disturb the original seizin, could of themselves work a discontinuance. Thus, Litt., sec. 598, page of Coke, 328 a, tells us, "If a tenant in tail be disseized, and he release by his deed to the disseizor and to his heirs all the right which he hath in the same tenements, this is no discontinuance; because a release passeth nothing but the right which may lawfully be released, without hurt or damage to others; and therefore nothing of the right could here pass to the disseizor, but for term of the life of tenant in tail, who made the release." Neither will a conveyance that takes effect by the statute of uses operate a discontinuance, where the possession remains with the party; for in such cases the original seizin is not disturbed: there is no transmutation of possession — a mere bargain and sale, it is conceded, cannot operate a discontinuance. A feoffment certainly may. Thus Litt., sec. 595, page of Coke 326 b. "If tenant in tail of certain land, thereof enfeoff another, etc., and has issue and die, his issue may not enter into the land, albeit he has title and right to this, but is put to his action, which is called a formedon en le descender." The conveyance referred to in the special verdict, and made a part of it, must be considered either as a feoffment or as a bargain and sale. Why should it not be considered as a feoffment?
A feoffment is defined by Justice Blackstone, 3 Comm., 314, "the gift of any corporeal hereditament to another." The apt words whereby to make it are "give, grant, enfeoff." To complete and perfect *Page 443 
feoffment, the feoffer used to give the feoffee seizin of the land; what the feudists called investiture. This was done by the ceremony called livery of seizin, which ceremony was held necessary to complete the donation. Had this ceremony been used at the time of making the conveyance, which we are now considering, that conveyance would undoubtedly have operated as a feoffment. It was an immediate gift of the inheritance. It has the technical and proper words, "give, grant, enfeoff." It was intended to operate on the possession as well as the right, the possession being here conveyed and the use limited to one and the same person. But our Act of 1715, cap. 38, secs. 5, 23, directs that all conveyances of land proved and registered as by that act directed "shall be valid and pass estates in land without livery of seizin, attornment, or other ceremony whatsoever." The necessity, therefore, of livery of seizin to perfect a feoffment is taken away by this act. The notoriety occasioned by a registration of the conveyance in the county where the land lies is adopted by the act as a substitute for the notoriety arising from the actual tradition of possession. This conveyance, therefore, having been duly proved and registered, should have the same effect as if livery of seizin had been made with it. It must then operate as a feoffment. Let it be remembered that the rule of law is, "That where conveyances may operate both by the common law and the statute of uses, they shall be considered as operating by the common law, unless the intention of the parties appears to the contrary." See Hargrave and Butler, Co. Litt., 271 b, note 231, III, 3, explaining the conveyance by lease and release.
But admitting the conveyance to be a bargain and sale, yet the warranty annexed to it works a discontinuance. Thus, Littleton, sec. 601, p. 327 b, observes that "if the tenant in tail release to his disseizor, and bind him and his heirs to warranty, and die, and this warranty descend to his issue, this is a discontinuance by reason of the warranty." For which Lord Coke immediately gives as a reason, "if the issue in tail should enter, the warranty, which is so much favored in law, would be destroyed." In note 284, to 330 a, of Co. Litt. it is also stated that although a bargain and sale, etc., etc., will not of themselves work a discontinuance, yet "if a warranty is annexed to a bargain and sale, etc., it may produce a discontinuance."
Here is a warranty. The words are: "I, the said Joseph Wells, for myself, my heirs, executors and administrators, do covenant, grant, promise, engage, and agree to and with the said Stephen Lee, his heirs, executors, administrators, and assigns, the above bargained land and premises, together with all the privileges, etc., etc., forever hereafter do warrant and defend against the lawful claim or demand of all manner of persons whatever." If, instead of do warrant, the phrase of to *Page 444 
warrant had been used, there would be much force in the observation made by one of the counsel for the plaintiff, that this is not an actual warranty, but merely a covenant to warrant. The expression is do warrant. The conjunction and, perhaps, should have been inserted, and then the intention of the parties would have clearly appeared. There would be then both a warranty to bar the issue and a covenant to indemnify and secure, which would bind executors. But without the insertion of the conjunction, if surplusage be rejected, there remains a clear warranty. If there be any ambiguity, the deed is to be taken most favorably for the grantee, and most strongly against the grantor.
Perhaps it will be said on the part of the plaintiff that, although there be a discontinuance which takes away the right of entry, and although an ejectment cannot (as has been shown) be brought but by him who has a right of entry agreeably to the general principles of law, yet that as actions of formedon have never been in use in this country, and as only such parts of the common law and such statutes as were in force and in use here before the Revolution are declared by our Legislature to be in full force now within this State; if the lessor of the plaintiff have but a right of property, that will be sufficient to support an ejectment. To this it is answered that, admitting that actions of formedon cannot be brought, it is the province of the Legislature and not of the courts to alter (if deemed necessary) the established principles of law; and that, if the courts could legislate on this subject, they would not do so in support of entails, which are so strongly reprobated by our Constitution and bill of rights. [See bill of rights, sec. 23, and Const., sec. 43.] But it is denied that actions of formedon may not be brought. Such actions are expressly taken notice of and jurisdiction of them given to certain courts and withheld from others. See Act of 1777, cap. 2, sec. 61, page 310, and Act of 1785, cap. 2, sec. 1, page 547.
3. It is denied by the defendant that the plaintiff has in him even a right of property, which would enable him to support any action; and it is insisted that the absolute title to the premises in dispute is in the heir of Stephen Lee, although Joseph Wells had but an estate tail when he conveyed to said Lee.
Let it be admitted that this conveyance passed a title prima facie good, yet defeasible upon the death of Joseph; defeasible, if not by entry, by suit. If it has not been defeated within the time prescribed by our Act of 1715, for quieting men's estates and avoiding suits in law, it has become absolute and indefeasible. Examine the second section of that act and it will be seen that this case is one to which it applies. "All possessions of or titles to any lands, etc., etc., derived from any sales made either by creditor, executors, or administrators of any person deceased, or by husbands and their wives, or by husbands in right of *Page 445 
their wives, or by endorsement of patents or otherwise, of which the purchaser or possessor, or any claiming under them, have continued or shall continue in possession of the same for the space of seven years without any suit in law, be and are hereby ratified, confirmed, and declared good and legal, to all intents and purposes whatsoever, against all and all manner of persons; any former or other title, or claim, etc., etc., to the contrary notwithstanding."
It would not have been easy to find language more strong, more comprehensive than the Legislature have used. This is a title derived under a sale, and the purchaser has continued in possession more than seven years without suit at law, while there were persons in being entitled to bring suit, and who did not come under any of the exceptions afterwards mentioned, who were not infants, femes covert, non compotes, imprisoned, or beyond seas. This title, therefore, thus derived, is, in the words of the act, good and legal, to all intents and purposes, against all and all manner of persons.
It may be contended on the part of the plaintiff that the above recited clause was intended to operate only on sales that had been made previously to the act. But no evidence of such an intention is to be found in the act itself. The participle "deprived" is used generally, and is as susceptible of a future as of a past signification. No auxiliary is prefixed to it to limit its time. It might with equal propriety have been subjoined to the verb to be, used in the future, as in the past tense. If the Legislature had intended that this clause should operate only on titles that had been
derived, it is presumable they would have so expressed themselves. If they had meant it to have effect only on such titles only as should thereafter
be derived, it would have been equally easy to declare such intention in plain and precise words. Having used the word indefinitely, it is conceived they had in view both description of cases. But should such a construction be put on this clause as the plaintiff will probably contend for, such a construction as will prevent its application to the present case, it is nevertheless firmly believed that the subsequent clauses of the act, the third and fourth, will be sufficient for the defendant's purpose. Before our Act of 1715 there were times of limitations settled, beyond which no man, either in an action to establish the right or to recover the possession, could avail himself of the seizin of himself or his ancestors, or take advantage of the wrongful possession of his adversary. By the statute of 32 Henry 8, cap. 2, sixty years were made a limitation to a writ of right, and fifty years (in general) to an assize and writ of entry. By the statute, 21 James 1, cap. 16, twenty years were fixed as a limitation to entries and ejectments, and to actions of formedon. The words of this last mentioned statute as to formedons are strong and pointed. "All writs of formedon in descender, etc., etc., *Page 446 
of any manors, etc., etc., at any time hereafter to be sued or brought, by occasion or means of any title or cause hereafter happening, shall be sued and taken within twenty years next after the title and cause of action first descended or fallen, and at no time after the said twenty years." By this statute, if an action of formedon was not brought within twenty years after the right to such action had first descended, that is (as in our case), after the death of the tenant in tail who discontinued, such an action could never afterwards be brought, neither by the immediate issue, who permitted the twenty years to elapse, nor by the issue of that issue. The statute does not distinguish between them. It would indeed have been idle to have called it a statute for avoiding suits in law, if it had permitted the subsequent issue in tail at any indefinite period of time to have brought an action of formedon, provided twenty years had not elapsed since his alleged title had descended. Were this the case, the discontinuee and his heirs might enjoy the lands purchased for centuries, and yet be liable on the death of every heir of the body of the first tenant in tail to be evicted by his successor. That the construction contended for by the defendant is correct will appear pretty evident from the comment of Lord Coke on the statute, 22 H., 1, and the note thereon. Co. Litt., 115 a, and note. Twenty years are also the limitation to entries by this statute. Our Act of 1715, by its third and fourth cases, makes seven years a limitation to all actions respecting land, by declaring that no person shall either "enter or make claim" but within that period after the right to entry or claim accrues; and by declaring further that, with certain exceptions as to infants, etc., a possession of 7 years without entry or suit in law shall be a perpetual bar against all and all manner of persons whatsoever, "that the expectation of heirs may not in a short time leave much land unpossessed, and titles so perplexed that no one will know of whom to take or to buy lands." Joseph Wells, it will appear from the special verdict, died in 1787. David, his eldest son, lived till 1798; Stephen Lee, and those claiming under him being in actual possession of the premises during the whole period.
4. The defendant also urges that his right to the possession of the premises is completely established, if it should fail on the preceding grounds, by the Act of 1784, cap. 22. If that act converted the estate tail (admitting for the moment that such it was) into a fee simple, the plaintiff is undoubtedly barred by the act of limitation.
The clause of the act which is believed to have this effect is the fifth. This clause, reciting that "Entails of estates tend only to raise the wealth and importance of particular families and individuals, giving them an undue influence in a republic, and that they prove in many instances the sources of great contention and injustice," enacts, "That from and *Page 447 
after the ratification of the act, any person seized or possessed of an estate in general or special tail, whether by purchase or descent, shall be held and deemed to be possessed of the same in fee simple, fully and absolutely, without any condition or limitation whatsoever to him, his heirs and assigns forever, and shall have full power and authority to sell and devise the same as he shall think proper, and such estate shall descend under the same rules as other estates in fee simple;" and it further ratifies and makes valid all sales made by tenants in tail, in actual possession since the first day of January, 1777. This act undoubtedly is entitled to the most liberal construction, since it is made in consequence of a constitutional injunction. Its title is, "To do away entails." The words "seized or possessed," in the former part of the clause, should not be confined to mean actually possessed; for in the latter part of the clause the words "actually possessed" are made use of: The expression would not have thus varied if the meaning remained the same. It is therefore conceived that the entail of the lands sued for was broken by the Act of 1784.
The sons of Joseph Wells were entitled, on his death, to a fee simple therein, and as they did not prosecute their claim within the period assigned by law, all deriving title under them are forever barred. A construction similar to this has been, it is said, put upon this act by the Federal Circuit Court of this State in the case of Harrison v. Gilmour.
Thus, therefore, the defendant insists:
1. That Joseph Wells was seized in fee at the time of his conveyance to Stephen Lee.
2. If he were seized in tail, that this conveyance worked a discontinuance which has taken away the right of entry, without which an ejectment cannot be supported.
3. That seven years possession since the death of Joseph Wells had under the Act of 1715 perfected and completed the title of Stephen Lee.
4. That the estate tail was broken by the Act of 1784, and claim not having been made within the time prescribed in our act of limitations, the sons of Joseph Wells and all claiming under them are forever barred.
Should any one of these points be determined in favor of the defendant, the plaintiff cannot have a judgment. If all the grounds of defense taken should fail, it is submitted whether the plaintiff can recover but a ninth part of the lands sued for. Joseph Wells died since the Act of 1714, leaving three sons — David, the eldest son, died since the Act of 1795, leaving issue, besides the plaintiff, a son and a daughter. The Act of 1784, regulating descents, directs that all the sons should inherit equally, and the Act of 1795 places the daughters on the same footing with the sons. *Page 448 
The act provides for two cases. One where tenant in tail is found in possession at or after the act; his estate tail is converted into a fee; if he is not in possession, but has a right to it only, that right is not impaired, nor his remedy to recover it abridged. As the object of the act was to do away [with] perpetuities, it was not necessary to this end that rights of entry of tenant in tail should be destroyed, nor the defeasible estate of a wrongful possessor should be rendered indefeasible at the expense of tenant in tail out of possession. For the estate, when recovered and reduced into possession, instantly becomes a fee by the operation of the act, and the perpetuity as completely done away as it could be by annulling rights of entry; and, moreover, the invasion of the right of property is avoided; the words "seized or possessed," etc., were purposely inserted to exclude the idea of intermeddling with rights of entry or of action.
The other case provided for is that of a solely tenant in tail after the first day of January, 1777, evincing a clear intent not to interfere with alienations made before that period, and to leave them as they were under the regulation of the laws in being. The case before us falls under neither of those branches of the act, and is in no wise affected by it.
What, then, was the law as it regards this case before and at the passing of the Act of 1784? It was, that a conveyance by tenant in tail made by bargain and sale, release, covenant to stand seized, or other conveyance not operating by way of feoffment, passed no more to the bargainee than the bargainor could lawfully convey: A base fee, determined by the entry of issue in tail, and, consequently, by his ejectment. Litt., secs. 606, 607, 609, 610; 2 Ld. Raymond, 778; 3 Burrow, 1703. Lee's estate was of this kind, and was defeasible by entry or ejectment of the issue in tail, and is so at this time, unless the right of possession of the issue has been destroyed by some of the means adverted to in the objections raised against his recovery. These shall now be considered and be attempted to be removed.
The first objection is, that the estate of the surviving devisee, which came to him on the death of his brother, was not an estate tail, but an estate in fee, and well conveyed to Lee. Answer: Supposing this to be so, he had still an estate tail in his own moiety, and we are entitled to recover that, though the objection be valid; but it is not valid; the limitation, if I recollect it, is "if the survivor die without heirs, then to the right heirs of devisor." Now, it is a rule that whenever an estate is limited to the right heirs of the devisor by will, and the quality of the estate is not altered by the devise, the right heirs take by descent, as well *Page 449 
that they may be liable to the specialty debts of the ancestor as to the feudal duties owing to the lord. Then, the estate contained in this limitation came by descent, immediately on the death of the devisor, to one of these devisees; for it is not stated, and therefore cannot be assumed, that he had any other sons: On the death of the last son, it descended on some one, who was both the heir of the son and of the devisor; it was impossible, therefore, that the survivor could die without heirs general so long as there were heirs of the devisor, who necessarily were his heirs also to take; and, consequently, the dying without heirs here spoken of must have been intended heirs of the body, and create an estate tail. Cowp., 234; 1 P. W., 23; Salk., 233, pl. 12. The defendant cannot say the devisor might have an elder son by another venter, who was the heir of the devisor, and not the heir of the surviving devisee: No such fact is found by the verdict, and we cannot travel out of it; nor was any such fact proved on the trial, were we allowed to travel out of it. In the case cited from Salk. and P.W., it was taken that A. was the heir of the devisor, and the brother of the whole blood to B., it not being found otherwise; so here there is no finding that the devisees were not of the whole blood, nor that there was any son of the devisor who was his heir and not the heir of the devisees, in case of their deaths without children. Therefore, on the death of the survivor, the estate limited to the right heirs of the devisor must have gone to the eldest son of the survivor; or, had he died without children, to the uncle on the father's side, being precisely the same persons who are heirs of the survivor, and also heirs of the devisor, and then the limitation of the estate to the survivor on the death of his brother, and for want of heirs of the survivor, over, is the limitation of an estate tail; Fearne, 4 Ed., 350, 351.
Again, the intent of the devisor is plain, that the survivor, on the death of his brother, shall have an estate descendable to his heirs, but at the same time such an estate as leaves another estate for the heirs of the devisor; and this is the very description of an estate tail. There is no way to get over considering it as such but by supposing the devisor had an elder son by another venter; but, for the reasons already given, no such supposition should be made. If it can legally be made, the cases from Salk. and P.W. are not law, for in these there was as much room for such supposition as here; there was no finding in these cases that there was not an elder son of the half blood. The survivor, then, of these devisees was seized of an estate tail in both moieties, with the reversion in fee to himself by descent.
Another objection is that a feoffment in fee by tenant in tail works a discontinuance, and that the deed to Lee is a feoffment. The law, as stated, is not denied; but it is denied that this deed is a feoffment. The *Page 450 
deed agrees in every part of its description with that of a bargain and sale, which is, "a contract in consideration of money, passing an estate in lands, by deed indented and registered." 1 Ba. Ab., 273. The words "alien, grant, enfeoff," are as proper for a deed of bargain and sale as the words "bargain and sell"; Sanders, 345; 8 Rep., 93 b, 94 a; 3 Leonard, 16, pl. 39. Should the word "enfeoff," therefore, be found in this deed, no just inference can thence be drawn in favor of the objection; the same argument would convert almost every deed into a feoffment, for it is very general and in almost all deeds. We should look well to the consequences of such an opinion before it be adopted. What is a feoffment? The definition of it is, "a conveyance by delivering possession upon or within view of the land conveyed." Sanders, 206. A deed forms no part of the conveyance, though it may accompany the feoffment, and is of use to evidence the quantity of estate conveyed; 2 Ba. Ab., 483; still, however, if the deed expresses an estate in fee, and the feoffer deliver seizin for life, the feoffee can hold but for life; Litt., sec. 359; Co. Litt., 222 b; for the estate passes by the livery, and not by the deed. There was no livery; whatever estate passed, passed by the deed; it was not a conveyance by feoffment, for nothing can constitute a feoffment but livery and seizin. It is argued, however, that the Act of 1715, cap. 38, sec. 5, allows of a feoffment, without livery and seizin; if this be so, the act has changed the nature and description of a feoffment, and has made a deed to be a feoffment, which, before, it could not be. The words which are supposed to have worked this alteration are, "all deeds registered shall pass estates in lands without livery of seizin, attornment, or other ceremony." Does it follow that because livery and seizin, or feoffment (for these terms are synonymous), are rendered unnecessary or unessential to the passing of estates in lands, that, therefore, deeds conveying estates shall be deemed feoffments? Certainly no dispensing with livery and seizin is dispensing with feoffment. If a man chooses to convey by feoffment, he may; but then he must perform all the ceremonies which are requisite to constitute a feoffment; otherwise, it will not be a conveyance by feoffment, since the act any more than before.
Admit, however, that the nature of a feoffment is changed by the act from what it was, and that some ceremonies are now omitted which were formerly essential; the consequences and the effects of the omitted ceremonies will cease with them, causa cessante, cessat effectus. Then, it follows that the discontinuance, being the effect of livery and seizin, ceases with it. Wherefore is it that a discontinuance is operated by the feoffment of tenant in tail? It is because tenant in tail, having the inheritance, and the possession of the inheritance, not a possession for life only, coextensive with the quantum of interest in the estate, and *Page 451 
transferring it by livery, not only passes the possession for his life, which he lawfully may transfer, but also the possession of the inheritance, which belongs to the issue, and which he ought not to transfer; and so leave no right of possession which can descend to the issue, but a right of property and of action to recover it; which is a discontinuance. Gilb. on Tenures, 108, 109. It is the actual transfer of the possession which produces this effect; and, accordingly, if he passes the estate by deed, for instance, a bargain and sale or release, which latter is a conveyance of the common law, that passes no more than he lawfully may pass, namely, a possession for the life of the grantor, leaving a right of possession to descend to the issue, and works no discontinuance; Litt., secs. 598, 599, 600, 601.
If, then, livery and seizin be the cause of the discontinuance, where tenant in tail conveys by feoffment, where he conveys by deed, called a feoffment without livery of seizin, there will be no discontinuance, unless the argument goes further and proves that the act meant to impart to this deed, called a feoffment, all the properties of a true and proper feoffment. That cannot be maintained, for the act gives to the deed registered the property of passing the estate in the land; not to the actual possession of it. What is this estate which the deed passes? No more than the interest or estate which the grantor may lawfully pass. It surely was not the intent of the act to make the deed pass a tortious estate, like the feoffment, whereby tenant for life, or other inferior estates, may pass a fee, and displace remainders and reversions, and turn them to a right, unless entry be made in the lifetime of the alienee, who may, from the secrecy of the conveyance, not be apprised immediately of the deed. Considering the deed as a feoffment, to all purposes, will draw after it these consequences; and what, then, is become of the estates of remaindermen and reversioners placed in this situation? There is no remedy in this country but the ejectment; the benefit of this will be lost to them.
Another objection is that a deed of bargain and sale, with warranty, works a discontinuance; and if this is not a feoffment, it is a deed of bargain and sale, with warranty; the law is admitted, but here is no warranty at all.
"A warranty is a covenant real, annexed to lands or tenements, whereby a man and his heirs are bound to warrant the same, and either upon voucher, or by a judgment upon a writ of warrantia chartae to render other lands to the value of those that shall be evicted by a former title, or may be used by way of rebutter." Co. Litt., 365 a.
In our case the covenant is not annexed to lands; for if the grantee be evicted and die, his executors must sue upon it. Bul. N.P., 158; 2 Levinz, 26, 62. An action of covenant is the proper remedy, not a warrantiachartae; it is a covenant binding his executors and *Page 452 
administrators, for they are expressly named in it; a warranty cannot affect executors and administrators, but the heirs of the warrantor only. When the executors or administrators shall be sued, the recovery will be in money, not in lands; for they have no lands of equal value to give. No one will deny but that if the grantee be evicted the executors of the grantor and his personal estate are liable to retribute the lessee; then it cannot be a warranty, but a covenant for warranty, or to warrant, like that stated in 1 Vesey, 516; 2 Bl. Com., 304. Had the expression been, "I covenant to warrant," there could have been no doubt. "I covenant for my heirs, executors, etc., the lands, etc., do warrant," amounts to the same thing; the warranty in both instances is placed in the infinitive mood; turn it into Latin, it is convenio me warrantizare. If both the covenant and the warranty be placed in the indicative mood, some part must be rejected to make sense of the rest. If we reject that part of the covenant which is personal, "I covenant for myself, my heirs, executors, etc., do warrant," there will indeed be a warranty, but not one that answers the purpose of the defendant; for the heirs of the warrantor are not named. Co. Litt., 383b, 384 b. The warranty expired with the life of the warrantor, and never descended upon the heirs, so as to create a discontinuance.
If it be argued that the words are to be taken most favorably for the grantee, the answer is, a personal covenant, binding both executors and heirs, both the real and personal estate, is most favorable for him; 2 Bl. C., 304; and no doubt such was the intent of the parties. This was an estate tail, liable to be reclaimed; it was proper that the grantee should have the highest possible security, and a resort both to real and personal estate of the grantor. For what would have been his situation if the grantor had no real estate, but personal enough, at the time of eviction? The grantee, if this were a mere warranty, could have no recompense at all.
But say here is a warranty, annexed to the lands and binding on the heirs of the warrantor; what then is the result? On the death of the surviving brother, after 1784, it descends on his heirs, his three sons; on the death of the elder of those, after 1795, one-third of the warranty descended on his three children, and the lessor of the plaintiff is liable to one-third of that one-third only, Co. Litt., 393; he can only be rebutted for one-ninth part of the premises sued for; the other eight-ninths he is entitled to recover. Warranty always descends to those who are the heirs of the warrantor, by the general law of the country; otherwise, it would serve but little purpose for the protection of estates; for then, instead of rebutting the claim of all the heirs of the warrantor, it would rebut the claim of one only; the others might recover notwithstanding the warranty. For example, the father conveys, and warrants the lands *Page 453 
of the grandfather, and dies, leaving ten sons or children; the grandfather dies; the elder son, if the warranty descends upon him, only will be rebutted; the other nine may sue, and cannot be rebutted; but if it descends on all, then all are rebutted.
Another and last objection, but much relied on, is the act of limitations, and the lapse of years in the time of the issue of the grantor, after the death of the grantor; which, it is argued, barred that issue, and on his death the issue now plaintiff.
It would be an unaccountable circumstance if tenant in tail, or the issue in tail, were not allowed to bar his issue by any deed he could execute, nor by any release he could give to the bargainor, however solemnly executed; but could effect the same thing by his laches.
The act of James is, word for word, the same with our act of limitations, except as to the additional words in ours, which will presently be commented on. Under that act, if the tenant in tail, or issue in tail, be barred of his entry, that will not bar the next issue in tail. Com. Rep., 124. For the words of the act are, "No person or persons shall at any time hereafter make an entry into, etc., but within twenty years next after his right or title which shall first descend or accrue to the same." As the title of the issue first accrues on the death of his ancestor, then, and not before, does the time begin to attach upon him.
It is true our act has an additional expression: "All possessions held without suing such claim as aforesaid shall be a perpetual bar against all and all manner of persons." Therefore, says the defendant, the issue in tail shall be barred, for he is directly within the general expression, "all and all manner of persons."
A little reflection will demonstrate the incorrectness of this idea. Nothing more can be meant by it than that all and all manner of persons shall be barred, who, having a right of entry, have not exerted it within the limited time; it were too unreasonable to say that the party by his neglect should bar any other estate than his own, or should give an indefeasible fee against all persons entitled after him, as well as against himself. Let us suppose a case: A. is tenant for life, B. the reversioner. A. is ousted and the seven years lapse. B. is as much within the expression, "all and all manner of persons," as the issue in tail is; yet no one will attempt to say that B. is barred by the laches of A., the tenant for life. No; A.'s estate is barred, then, perpetually, and the estate of the possessor is rendered indefeasible to the extent of A.'s estate that is barred, and no further. Whatever estate is lost by the neglect of the owner to enter within time, the same estate is acquired by the possessor; for the right of possession of the true owner becoming extinct, by the operation of the act, and there being no person who can bring forward a claim of possession to disturb the possessor, his title is secured thereby. *Page 454 
The possessor only acquires an indefeasible fee when the estate of the owner neglecting to enter is a fee. In the case put, the owner or tenant for life is perpetually barred, and all and all manner of persons whatsoever, as to that estate which belonged to A., namely, an estate for life; so, in the case before us, the issue neglecting to enter was perpetually barred, and all and all manner of persons claiming his estate, whether by execution, sale, or other purchase; but, as in the case put, the tenant for life cannot affect by his laches any other than his own estate; so neither can the issue in tail who neglected to enter affect any other than his own estate. And the issue in tail and reversion may enter when his title accrues by the death of the preceding tenant.
The position would be monstrous that tenant for years, for life, in dower, by the curtesy, might vest an indefeasible fee in the possessor, by not entering within seven years, and bar those behind them forever. A. having no right, might convey to B., and give him a color of title, B. enter, and the particular tenant refuse to sue him till the seven years were expired; and as all and all manner of persons were thereby perpetually barred, and an indefeasible fee vested in B., the reversioner, remainderman, and heir of the estate held by curtesy could never recover. Yet the meaning attempted to be put upon the words, "all and all manner of persons," extends as much to these persons as to the issue in tail. The title of any of them does not accrue till after the death of the precedent temporary owner, and the case of the issue in tail is not distinguishable from any of them; it is impossible that the construction contended for can prevail.
I am of opinion that this case is not affected by the Act of 1784. That act converted no estates tail into estates in fee, but such whereof there was a person "seized and possessed," and confirmed only such alienations in fee as had been made by tenants in tail in possession since the year 1777. Joseph Wells aliened the land in 1760, and no one has ever been "seized in tail therein from that period to this day." I think this therefore a casus omissus; one for which the Legislature has not made provision in their Act of 1784. I am also of opinion that if the plaintiff is entitled to recover at all, he is entitled to recover the whole of the land contained in the declaration of ejectment; for that (539) the Acts of 1784 and 1795 regulated the descent of fee simple estates alone, and meddled not with the descent of entails. On all the other points my opinion is favorable to the defendant. I incline to the belief that Joseph Wells was actually seized in fee at the time of his conveyance to Stephen Lee; and that if he were seized in tail, a discontinuance was operated by the conveyance, which barred the right of *Page 455 
entry of his issue. This conveyance, I think, should be regarded as a feoffment, but if it were viewed as a bargain and sale, there was a clear warranty annexed, which gave it the same effect as to the operation of a discontinuance. With respect to the statute of limitations, I entertain no doubt but that, as neither entry or claim has been made on Stephen Lee or his heirs, within seven years after the right to defeat his title had first descended (that is, within seven years after the death of Joseph Wells), and as the person then entitled to make such entry, or bring such suit, did not come within any of the exceptions mentioned in the act, the lessor of the plaintiff could not disturb the possession of the defendant. The long possession of Lee and of those claiming under him is, in the words of the act, "a perpetual bar against all and all manner of persons whatever."